20520. GAY, receiver, *v.* HURST, administratrix.

DECIDED OCTOBER 7, 1930.

*Hitch, Denmark & Lovett,* for plaintiff in error.

*Stella Akin, Shelby Myrick,* contra.

LUKE, J. Mrs. Eula Hurst, as administratrix of the estate of Orien A. Hurst, brought an action under the Federal employer's liability act against C. E. Gay Jr., as receiver of the Savannah & Atlanta Railway, for damages alleged to have been sustained by herself and her minor daughter, Rosalie Hurst, widow and daughter respectively of said Orien A. Hurst, who, while in the employ of said railroad as switchman, was killed by falling between two cars of a train of said railroad near Savannah, Ga.

The trial resulted in a verdict for the plaintiff for $7,000,— $5,000 for the widow and $2,000 for the daughter. The motion for a new trial contains the general and four special grounds. The first question for decision is whether or not the court erred in overruling the demurrer to the petition.

1. Omitting some of the formal allegations and some of the details that are not necessary for the purposes of this decision, the petition sets out substantially this case: Said railway owns, operates, and controls a railroad extending from Savannah, Ga., to Camak, Ga. Its switch-yard is located about three-quarters of a mile from "Central Junction" terminal in Chatham county, Ga. Defendant's main line runs in a northwesterly-southeasterly direction. To the southwest of said main track there are three or more switch-tracks about a mile in length, running parallel to said main track and leading into it.

At about 11 o'clock on the night of December 11, 1928, defendant's freight-train from Camak arrived in said switch-yard. On the arrival of the train it was the duty of the switching-crew of engine 115, of which said Orien A. Hurst was a member, to remove

150

certain cars from the train and replace them with others. After the switching was completed there were 26 cars left on the main track, several of them not coupled together. Said switch-engine coupled up to the southeast end of the cars in order to pull them out of the yard and on towards Savannah. The next coupling was made by said Orien A. Hurst. After all the cars were coupled up it was the duty of said Hurst to get on top of the cars and proceed to the rear of the train; and, after making the coupling, Hurst did get on top of the cars. The engine and cars were on the main line about midway of the yard, and when the engine started it had to go up a slight grade. Engine 115 was small and moved 26 loaded cars with difficulty. When it was finally coupled up to all the cars on the main line and was ready to pull them out, "the water in said engine was extremely low, and the said switch-engine foreman ordered the engineer to move out as quickly as possible, and as fast as possible, so as to get a water-tank further down towards the City of Savannah and replenish his water supply." Said order was unknown to Hurst, and while the engine was moving slowly, and while he was walking over and on top of the cars towards the rear of the train, "the said engineer suddenly applied all his available steam and power to his engine for the purpose of moving along faster and getting ahead more quickly by reason of his shortage of water, and this caused the engine and entire string of freight-cars to lurch forward suddenly and with great force and violence. The consequence was that at that instant the said Orien A. Hurst, who was then at or within a few feet of the opening between two freight-cars, about midway said train, was jerked off his feet and thrown down between the thirteenth and fourteenth cars from the engine, and fell between the wheels, and was immediately run over and crushed and mangled to death."

"The said death of Orien A. Hurst, your petitioner's husband, with whom she was living at said time, and upon whom she was dependent for support, was and is due directly and proximately to the carelessness and negligence of the said switch-engine foreman in ordering and directing the said engineer . . to move his engine and train quickly out of said yards, and likewise to the carelessness and negligence of said engineer in suddenly applying a great force of steam to his engine as aforesaid, and in thus causing his engine and train of cars to jerk and lurch forward with

great suddenness and great force and violence, instead of gradually applying his steam and moving his engine and train of cars forward gradually . . both the said foreman and engineer well knowing that Hurst, and possibly the other switchmen, were somewhere on the top of the train and would be in danger of being thrown off the tops of the cars by any sudden and forcible movement of the engine and train forward, and that Hurst and the said other switchmen would thus likely be killed or injured." Petitioner's husband was free from fault and was where he had a right to be, and in no way contributed to the causes which brought about his death.

"14th. Petitioner as the administratrix of the said Orien A. Hurst therefore brings this suit against the said defendant for the benefit of Eula A. Hurst, surviving widow of Orien A. Hurst, and Rosalie Hurst, minor daughter of Orien A. Hurst and Eula Hurst, and says that by reason of the negligent homicide of the said Orien A. Hurst in the manner hereinbefore set out, the said defendant became liable to petitioner for the pecuniary loss sustained by said widow and said minor child, which loss this petitioner alleges is the sum of $30,000."

Only grounds 1 and 4 of the demurrer are insisted upon by counsel for plaintiff in error. They are as follows: "1. The allegations of the petition fail to set forth a cause of action against the defendant and said petition is insufficient in law." "4. Defendant specially demurs to the 14th paragraph of the petition, upon the ground that no facts are alleged showing why "the pecuniary loss sustained by said widow and said minor child" amounts to the sum of $30,000. In their brief, counsel for plaintiff in error make this statement: "The general demurrer was based on the ground that the petition did not allege any unusual, unnecessary, or extraordinary jerk of the train from which the plaintiff's husband fell." We are well aware that in cases like this the employees assume the ordinary risks of their employment, and that it is essential for them to show that an alleged negligent jerk was unusual and unnecessary. See *Central R. &c. Co.* v. *Sims*, 80 *Ga.* 749 (2), 754 (7 S. E. 176); *Ball* v. *Mabry*, 91 *Ga.* 784 (18 S. E. 64); *Augusta Ry. Co.* v. *Lyle*, 4 *Ga. App.* 113 (60 S. E. 1075). However, if the facts alleged *do show* that the jerk was both *unusual and unnecessary,* the case is not destroyed merely because

those words are not used in the petition. It will be observed that in the case at bar the pleader alleges that the switch-foreman ordered the engineer to run as fast as possible in order to reach a water-tank, and that at a time when Hurst was where it was his duty to be and the train was moving slowly the engineer suddenly applied all his available steam and power to his engine, causing the entire train to lurch forward suddenly with great force and violence, and jerking Hurst off his feet and throwing him between the cars. We are satisfied that the petition in effect alleges that the jerk of the train at the time and place and under the circumstances stated was both unusual and unnecessary, and hold that the petition was good as against the general demurrer.

2. We are aware that the measure of damages recoverable in a suit under the Federal employer's liability act is the amount the deceased would have contributed to his legal beneficiaries if he had lived. *Tallulah Falls Ry. Co.* v. *Davis,* 26 *Ga. App.* 215 (1) (105 S. E. 712); Michigan Central Railroad *v.* Vreeland, 227 U. S. 59 (33 Sup. Ct. 192, 57 L. ed. 417, Ann. Cas. 1914C, 176); Am. Railroad *v.* Didricksen, 227 U. S. 145 (33 Sup. Ct. 224, 57 L. ed. 456). However, construing with the other allegations of the petition paragraph 14 hereinbefore set out, we are satisfied that the special demurrer was properly overruled, and we so hold.

Before proceeding to discuss the grounds of the motion for a new trial, we deem it proper to set out the gist of the defendant's answer and some of the testimony in the case.

The answer admitted that C. E. Gay Jr. was receiver as alleged: admitted that the Savannah & Atlanta Railway owned and operated said line of railway, switch-yard, engine, and cars; admitted jurisdiction; admitted that decedent and defendant were engaged in interstate commerce; denied that it was the duty of decedent to get on top of the cars and proceed to the rear of the train; admitted the arrangement of the switch-yard and tracks as pleaded in the petition; admitted that the train in question was composed of twenty-six cars and had to be switched as alleged in the petition; and, after denying the other material allegations of the petition, further set out that the decedent met his death accidentally and without any fault on the part of the defendant, his agents and employees, and that sitting and walking on top of the cars were the ordinary risks of Hurst's employment, and were assumed by him. Mrs. Eula

Hurst testified: that her husband, Orien A. Hurst, was earning $200 a month working as a switchman for the Savannah & Atlanta Railway; that witness and decedent had only one child, Rosalie Hurst, who was eighteen years of age and living with them; that decedent was forty-one years old at the time of his death; that he did not work for five weeks prior to his death, because of sickness, but that he went back to work on the day he was killed, and was perfectly well; that they owned no home; that her husband did not own an automobile, but was driving an old one he had contracted to buy on credit; that "we got everything he made," meaning that the money was not spent otherwise than on decedent's family; that Hurst had been working for the Savannah & Atlanta Railway for seven years; and that said railroad was not doing such a large business, and that sometimes decedent did not work on Saturdays and Fridays.

Henry Wright testified: that Orien A. Hurst was killed on a clear night; that when he first noticed the train it was moving slowly on the main track; that he saw a man with a lantern in his hand get up on a lumber car; that the man was Orien A. Hurst; that he set his lantern down about the middle of the car on top of the lumber with which it was loaded and walked towards the rear of the train; that witness heard a squeaking noise such as a tight brake would make; that "just before he got to the end the engine jerked off in a kind of a strong swinging movement, or jerking, that way," and the cars bumped together; that there was an exhaust from the engine and the cars bumped together; that just as the car jerked, Hurst went towards the end of the car in a kind of falling position; that the train moved fast after the jerk; that when Hurst started falling he was five or six feet from the end of the car; that witness did not see the result of the fall, and did not know what became of Hurst until he was ordered to pick up the fragments of his body the next morning; that the noise he heard indicated that the brake was set, and that in such a case it would be the duty of a switchman to go and see about it; and that if he did that, he would have to set his lantern down. T. W. Parker testified: that he was switch-engine foreman, and was in charge of making up all trains; that there was no unusual exhaust when the engine started; that if there was any jerk he could not tell it from where he was; that there was plenty of water in the engine but

very little in the tank; that he did not see Hurst fall, but found his body; that the engineer sent witness word to keep the tracks open and not to block him, because the water was getting low; that witness told Hurst to make it snappy—get the train on, get back to water; that the train had gotten to Savannah before Hurst was missed; that Hurst's lantern was found sitting on the flat car just behind "those two braces," as shown by a photograph which was put in evidence; that there was not any brake set on the train; that it was not customary for a brakeman to walk on top of a train at night without having his lantern in his hand. L. B. Watson testified: that he was engineer on the locomotive which was drawing the train from which Hurst fell; that the train was made up of sixteen loaded cars and ten empty cars, and that the engine was capable of pulling them with ease; that witness sent the switch-engine foreman word that the water was getting low, and that if he had much more to do, witness would have to go to Savannah for water and come back and complete the work; that witness did not suddenly apply all his available steam power to his engine, as there was no necessity for that; that when witness last saw Hurst he was walking on the ground towards the rear of the train after it had started towards Savannah; that he did not know that Hurst was missing until the train had reached Savannah; that they went back on the engine and found Hurst that night; that from appearances Hurst fell between the thirteenth and fourteenth cars; that the water was getting low, but that there was some in the tank; that if the throttle was opened wide while the train was moving, the engine would slip and cause the train to jerk, but that he did not put on steam and the engine did not slip; and that if a brake caught it would be the duty of the switchman to go and unloose it, but that it was customary for the brakeman to carry his light with him.

Frank Warren, a switchman, testified that the engineer sent a message by him to Mr. Parker, the switch-foreman—told him to "tell some of them I am about out of water," and that he would have to "make it snappy;" that witness told Parker about the water; that he found Hurst's lantern sitting back of the first cleat across the end of the last car after the train had arrived in Savannah, and that it was then that they could not find Hurst and went back and found his body; that when a brake is set it is the switchman's duty to go and unloose it. P. H. Googe testified that there

was no up-grade in the switch-yard towards Savannah, and chief-engineer J. A. McLeod testified that the track was perfectly level. Norman Mathis, the foreman, testified that "there was no jerk on the engine at all;" that the water was "all right" and that they were in no hurry, and that he was not aware of anything unusual happening that night.

A photograph, which was in evidence, disclosed a flatcar loaded with lumber which was held in place by upright pieces of timber with strips nailed to the top of them across the lumber. The top of the lumber was comparatively smooth, and the last two cross-pieces nailed to the two upright strips ran over the lumber very near the end of the car.

The first two grounds of the amendment to the motion for a new trial are elaborations of the general grounds.

3. The third special ground complains of this excerpt from the charge of the court: "All that I can tell you is that plaintiff in this case must recover, if he recovers at all, upon satisfying your minds by the greater weight of evidence that the accident occurred in the way set out in the petition, that is that the engine and entire string of freight cars was lurched forward suddenly and with great force and violence, and that this caused the death of the intestate." The foregoing charge is alleged to be erroneous, (1) because it left out of consideration the fact that plaintiff would have to show that the jerk or lurch was unusual and unnecessary and could not reasonably have been anticipated by the intestate, (2) because the charge excluded from the consideration of the jury whether the jerk was unusual and unnecessary under the attendant circumstances, and whether or not the act mentioned constituted negligence, and (3) because the effect of the charge was to summarize what the court had already charged, and limit and qualify the court's previous instructions upon the assumption of risks and the duty of the decedent to exercise ordinary care to avoid the consequences of the defendant's negligence.

The court had previously charged fully and fairly the contentions of the parties, and as to assumption of risk, comparative negligence, and the burden of proof, and the court instructed the jury that if Hurst was "thrown from the car by an ordinary jerk of the freight-train," the plaintiff could not recover, and that the plaintiff could not recover unless the defendant was negligent as alleged and such

negligence resulted in the decedent's death. The court also properly charged the rule that the plaintiff could not recover if Hurst by the exercise of ordinary care could have avoided the consequences of the defendant's negligence.

The rule applicable to charges like the foregoing is properly expressed in the case of *Georgia Ry. & Power Co.* v. *Britt,* 31 *Ga. App.* 54 (119 S. E. 460), in this language: "Erroneous instructions by the court to the jury as to the rule of law on a material issue in the case are cause for a new trial, although the correct rule be given in another part of the charge, unless the judge calls attention to the erroneous instructions and specifically withdraws them, or unless 'it can with perfect safety and fairness be said that the jury were not misled to the injury of the complaining party'." It will be observed that it is true that the plaintiff certainly could not have recovered except under the conditions set out in the charge complained of. The court was apparently trying to emphasize the fact that the plaintiff could only recover by proving the main act of negligence alleged in the petition. We do not think that this excerpt had the effect of leading the jury to believe that the plaintiff could recover by merely showing that the decedent's death was caused by the sudden lurch of the train. Neither do we believe that this charge destroyed the other opposite portions of the instructions of the court upon the material features of the case. We do not think that it is reasonable to conclude that the jury thought that this excerpt was a summation of the court's previous instructions. In short, we are of the opinion that "it can with perfect safety and fairness be said that the jury were not misled to the injury of the complaining party," and that this ground discloses no reversible error.

4. We shall next discuss the ground based upon alleged newly discovered evidence, the general tenor of which was that plaintiff's main witness, Henry Wright, was not in or near the switch-yard on the night Hurst was killed, and therefore knew nothing about the occurrence. J. A. McLeod, chief engineer of the Savannah & Atlanta Railway, made an affidavit that a map attached to the motion for a new trial, which purported to show the arrangement of the switch-yard and to give distances between certain points, was correct. The affidavit of T. W. Parker, the switch-engine foreman, was that the map showed correctly the place where the body of

Hurst was found. H. R. Mincey made an affidavit to the effect that he was in the switch-yard on the night in which Hurst was killed, and that no one could have seen a man on top of the car Hurst was on from a distance of seventy feet, and that Henry Wright was not standing where he said he was when the accident occurred. G. T. Nalley, whose duty it was to assist Mr. P. H. Googe in investigating accidents, averred: that on the morning of December 12, 1928, he went to the yards to ascertain how Mr. Hurst met his death, and that when he asked Henry Wright if he had been in the yards the night before and knew anything about the accident, Wright replied: "I was in the yard early in the evening, but left the yard early and don't know anything about what happened;" that affiant's investigation failed to disclose that any one saw Hurst after he boarded the train, and that he did not know that Wright claimed to have been near the scene of the homicide until several days after he had testified in the case. M. S. Johnson, an employee of the railroad, averred: that he approached a crowd gathered about the place where Hurst's body was found and asked Wright what it all meant; that when Wright indicated that he did not know and affiant told him that Mr. Hurst had been killed the night before, Wright, with some excitement, said: "Do what?" Affiant further averred that Wright appeared much surprised, and that affiant did not communicate his conversation with Wright to any one until after the trial because he attached no importance to it. Lula Wright averred: that she was not married to Henry Wright, but that she lived with him as his wife and had two children by him; that Henry did not spend the night of December 11, 1928, at their home; that Henry told her that he did not know how Mr. Hurst got killed until his foreman ordered him to take up the fragments of Hurst's body; that prior to the trial of the case Henry told affiant not to let any one know what he was going to swear, but that he was going to testify that he saw the man get killed and "would get pretty good money out of the case;" that affiant told Wright that she would not swear to anything that she did not know was true, and Wright replied that no one would know about it unless affiant told, and that if she did, she would get into more trouble than he would; and that after Wright returned from court on the day the case was tried he said: "I think we winned the case." Charles E. Gay Jr. averred: that he was general manager of the Savannah

& Atlanta Railway and necessarily had to delegate to others the duty of investigating accidents; that P. H. Googe was specially charged with such duties, and that G. T. Nalley was Mr. Googe's assistant in making investigations; that he did not know that Henry Wright claimed to have seen Hurst after he boarded the train; that affiant's information was that no one saw the accident; and that he could not have discovered the newly discovered evidence by the exercise of ordinary diligence.

Each member of the firm of Hitch, Denmark & Lovett signed an affidavit to the effect that Messrs. Denmark and Lovett had sole charge of the preparation and trial of the case; that an investigation of Hurst's death was made by P. H. Googe and G. T. Nalley; that Googe was especially charged with the duty of making such investigations, and Nalley was accustomed to assist him in so doing; that the train crew of the train from which Hurst fell also assisted in the investigation; that certain statements of the train crew and others as to how the accident occurred and a copy of all the testimony at the coroner's inquest were furnished counsel, and that the file did not disclose that Henry Wright or any other person saw Hurst after he boarded the train; that in discussing the case one of the plaintiff's counsel insisted that the defendant was liable because of certain testimony adduced at the inquest to the effect that the water in the engine was low, but that such counsel never disclosed to the counsel for plaintiff in error with whom he was talking that Wright, or any one else, saw Hurst after he boarded the train; that the newly discovered evidence did not become material until after Wright testified, "and could not have been obtained between such time and the end of the trial, and was not known by affiants until after the verdict in said case had been returned," and that "for the reasons stated the same could not have been discovered by the exercise of ordinary diligence."

The verdict in the case was rendered on November 21, 1929, and it appears from the bill of exceptions that the subpœna docket showed that a subpœna had been issued for Wright on November 19, 1929.

It appears from the record that the chief investigator, P. H. Googe, whose duty it was to investigate the homicide and who did investigate it, testified at the trial, but made no affidavit bearing upon the ground for a new trial based upon newly discovered

evidence. We think that the court had the right to conclude from the affidavit of G. T. Nalley, the assistant investigator, that his quizzing of the witness Henry Wright was casual and not thorough. Two of the witnesses who made affidavits testified at the trial. Practically all the witnesses who gave material evidence at the trial were employees of the railroad, and every person who made an affidavit regarding newly discovered evidence, with the exception of Lula Wright, was in the employ of the railroad. Lula herself lived very near the scene of the accident. Henry Wright had been in the employ of the railroad for several years, assisted in gathering up the fragments of Hurst's body, and lived very near the scene of the killing. The subpœna docket showed that Wright had been summoned as a witness in the case two days before trial. Practically all of the alleged newly discovered evidence was impeaching in its nature.

It is true that "although newly discovered evidence may be somewhat cumulative of testimony previously introduced, and impeaching in its character, the real ultimate criterion by which the merit of such testimony should be measured is the probability of a different result." *Paden* v. *State,* 17 *Ga. App.* 112 (86 S. E. 287). But it is equally true that motions for a new trial upon the ground of newly discovered evidence are not favored, and "are tolerated where it is apparent that grave injustice would result unless the newly discovered evidence is admitted on another trial; and only when it is clear that ordinary diligence could not have discovered the evidence sought to be adduced, and that a different result, in view of the discovery, ought to obtain." *Central of Ga. Ry. Co.* v. *Clark,* 15 *Ga. App.* 16 (2) (82 S. E. 600). In his judgment overruling the motion for a new trial the presiding judge stated that he was not satisfied "that the evidence could not have been discovered before or at the trial of the case." After a careful analysis of the record we do not feel authorized to say that the court's conclusion was not correct. We have gone somewhat fully into this ground because of the fact that it covers by far the greater part of the motion for a new trial and is greatly stressed by counsel. Our conclusion is that the court did not err in overruling the ground of the motion for a new trial which is based upon newly discovered evidence.

5. The last question presented is whether or not the court erred

in overruling the general grounds of the motion for a new trial. To discuss this ground fully would be to repeat much of what has been said in our consideration of the special grounds. We have already set out the material evidence in the case, and we deem it unnecessary to repeat it. Suffice it to say that there is testimony to the effect that Hurst was forty-one years old and in good health at the time of his death, and that he had been earning approximately $200 a month; that he contributed a large part of his earnings to his family, which was composed of himself, his wife, and his minor daughter; that while he was in the discharge of his duties and at a place where he had a right to be, the engineer suddenly applied great power to his engine at a time when the decedent had no reason to believe he would, and that this caused a sudden jerk which threw Hurst between the cars and brought about his death. In the case of *Georgia, Florida & Alabama Ry. Co.* v. *Jacobs,* 15 *Ga. App.* 292 (82 S. E. 934), where a passenger was thrown from the platform of a passenger-coach by a jerk, the court said: "The evidence clearly showed that there was a 'jerk' while she was on the platform; whether it was 'sudden, violent, unusual, and unnecessary' was a question for the jury, under all the attendant circumstances, and this court can not say that there were no facts or circumstances from which an inference could have been fairly drawn by the jury that this jerk was 'sudden, violent, unusual, and unnecessary,' although no witness positively so characterized it." In the case at bar the evidence was in sharp conflict; but since, in our opinion, the evidence adduced by the plaintiff is sufficient to sustain the verdict, we hold that the court did not err in overruling the general grounds of the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*